IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SALVADOR MAGLUTA,

    Plaintiff,

      v.

F.P. SAM SAMPLES, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:94-CV-2700-TWT

## OPINION AND ORDER

This is a <u>Bivens</u> action against federal prison officials.  It is before the Court on the Plaintiff Salvador Magluta's Motion for Summary Judgment [Doc. 107] and the Defendants F.P. Sam Samples, Michael W. Garrett, Fred Stock and Michael Bell's Motion for Summary Judgment [Doc. 108].  For the reasons set forth below, the Plaintiff's motion is DENIED and the Defendants' motion is GRANTED.

## I. BACKGROUND

This case has a rather involved procedural history.  In April 1991, a grand jury indicted the Plaintiff in the Southern District of Florida on various charges involving cocaine trafficking.  The United States Marshals Service apprehended the Plaintiff in October 1991 and placed him in federal custody.  Three different facilities--one in Miami, one in Talladega, and one in Atlanta--held the Plaintiff following his arrest

T:\ORDERS\94\Magluta\msjtwt.wpd

and prior to his trial in 1996.  At his trial, the Plaintiff was acquitted.  Three jurors were subsequently convicted of taking bribes to throw the case.

The Plaintiff filed this <u>Bivens</u>[1] action in 1994 during his pretrial detention at the United States Penitentiary in Atlanta ("USP-Atlanta"), and the case has been progressing through the federal courts ever since.  The original complaint asserted a variety of constitutional claims relating to the conditions of his confinement.  The complaint concerned two periods during which the Plaintiff was confined to the Special Housing Unit at USP-Atlanta.  The first was for 39 days in October and November of 1993.  The second began on January 24, 1994, and lasted through the time of his criminal trial.  Initially, this action was stayed pending the outcome of his trial in Florida.  When the Plaintiff was acquitted of all the drug trafficking and conspiracy charges in early 1996, the stay in the <u>Bivens</u> action was lifted.  However, around that time, the Plaintiff was indicted in the Southern District of Florida for passport fraud.  The Plaintiff was released on bond and, near the end of his February 1997 trial on that charge, failed to appear in court.  An arrest warrant was issued for the Plaintiff, and he was convicted in absentia on February 7, 1997.  He was also later

---

[1]<u>Bivens v. Six Unknown, Unnamed Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).  In <u>Bivens</u>, the Supreme Court recognized a federal cause of action for damages based on the deprivation of constitutional rights by officials acting under color of federal authority.

convicted of obstruction of justice and money laundering.  He is currently serving a 195 year sentence in federal prison.

On March 25, 1997, while the Plaintiff was still a fugitive, the Court granted the Defendants' motion to dismiss this action, citing the fugitive disentitlement doctrine.  When the Plaintiff was apprehended in April 1997, he filed a notice of appeal from that Order.  On appeal, the United States Court of Appeals for the Eleventh Circuit reversed and remanded, concluding that the fugitive disentitlement doctrine was not appropriately applied because there was "no nexus between the Plaintiff's fugitive status and his Bivens action."  Magluta v. Samples, 162 F.3d 662, 664 (11th Cir. 1998).

The Court then dismissed all claims pursuant to Federal Rule of Civil Procedure 12(b)(6), concluding that the complaint failed to state a claim.  On appeal, the Eleventh Circuit found that Plaintiff's complaint was a "shotgun" pleading and condemned it for vagueness, lack of specificity and irrelevancy, but determined that Plaintiff should have been allowed to amend the complaint.  The Court of Appeals vacated the judgment and instructed that the Plaintiff's complaint be stricken and a repleading ordered.  Magluta v. Samples, 256 F.3d 1282 (11th Cir. 2001).  The Court complied with that mandate and ordered the Plaintiff to replead his claims to comport with Federal Rules of Civil Procedure 8 and 10.

The Plaintiff subsequently filed a First Amended Complaint alleging three counts of constitutional violations by the Defendants.  The Defendants again filed a Motion to Dismiss, which was granted.  The Eleventh Circuit affirmed except for the Plaintiff's Fifth Amendment due process claims.  The Court of Appeals vacated and remanded with respect to these claims, but noted that, as required in a 12(b)(6) motion, it had accepted as true all facts alleged in the complaint and had viewed all facts in the light most favorable to the Plaintiff.  Magluta v. Samples, 375 F.3d 1269 (11th Cir. 2004) ("Magluta III").  On September 7, 2005, Judge Evans recused herself from the case, which was then assigned to the undersigned.  The Plaintiff and the Defendants have filed Motions for Summary Judgment.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. DISCUSSION

The only claims remaining following the Eleventh Circuit's most recent opinion are whether the Defendants' decision to place the Plaintiff in administrative detention constituted punishment and whether the Plaintiff's procedural due process rights were violated by this detention.  In reviewing the Defendants' 12(b)(6) motion, the Court of Appeals was required to accept the facts as alleged in the complaint and take all reasonable inferences in favor of the Plaintiff.  Magluta III, at 375 F.3d 1276.  The Court of Appeals emphasized, however, the "hypothetical nature" of its decision and the Defendants' ability at summary judgment to:

> [E]stablish that legitimate reasons do in fact exist and/or the conditions of the confinement are not as harsh or prolonged as alleged.... Additionally, although Magluta has specifically alleged that he advised each defendant personally of the violations of his constitutional rights only to be rebuffed, and that each had personal involvement in relevant decisions, development of the record at summary judgment may reveal that one or more of the defendants in fact had no personal involvement or liability.

Id. at 1276 n.5.  The Defendants thus have the opportunity to come forward with evidence at this stage of the litigation to refute any factual allegations made in the complaint.  If the evidence changes, so too may the Court's decision.  See Jackson v. State of Ala. Tenure Comm'n, 405 F.3d 1276, 1283 (11th Cir. 2005).

As an initial matter, the Court must clarify the liability of the parties and the relevant periods of detention.  First, the Court finds that Defendant Associate Warden Bell is entitled to summary judgment due to lack of personal involvement in the Plaintiff's assignment to administrative detention.  Bell did not arrive at USP-Atlanta until June 21, 1994, when the Plaintiff was well into his second period of administrative detention.  It is also undisputed that he at no time had control over the Plaintiff's assignment to administrative detention. (Defs.' Mot. for Summ. J., Ex. 16.) Second, the evidence demonstrates that the other Defendants had no control over the Plaintiff's administrative detention after June 11, 1994.  The decision to place the Plaintiff in administrative confinement for the second time was made at the regional level by Defendant Deputy Regional Director Garrett with the concurrence of Defendant Regional Director Samples.   (Defs.' Mot. for Summ. J, Exs. 4, 5.) Defendant Warden Stock, while responsible for the Plaintiff's initial period of detention, was not personally involved in the decision to place the Plaintiff in administrative confinement during 1994.  Samples then retired on June 8, 1994, and three days later, Garrett left the Southeastern regional office to become warden at the Federal Prison Camp in Montgomery, Alabama. (Id., Exs. 4, 11.)  After June 11, 1994, responsibility for the Plaintiff's detention was turned over to the subsequent regional director who is not named in this lawsuit.  Thus, for the purposes of this

lawsuit, the Plaintiff's relevant periods of detention are one of 39 days at the end of 1993 and a second beginning on January 24, 1994, and extending through June 11, 1994, a period of 139 days.

The Defendants assert qualified immunity as a defense to all of the Plaintiff's claims.  The defense of qualified immunity "represents a balance between the need for a damages remedy to protect the rights of citizens and the need for government officials to be able to carry out their discretionary functions without the fear of constant baseless litigation." Kingsland v. City of Miami, 382 F.3d 1220, 1231 (11th Cir. 2004) (quoting GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1366 (11th Cir. 1998)).  Under this doctrine, "government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates 'clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.'" GJR Invs., Inc., 132 F.3d at 1366 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The threshold question in a qualified immunity analysis is whether the Defendants violated the Plaintiff's constitutional rights.  Siegert v. Gilley, 500 U.S. 226, 232 (1991); see also Saucier v. Katz, 533 U.S. 194, 213 (2001).  "Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time

consuming preparation to defend the suit on its merits." Seigert, 500 U.S. at 232. Where, as here, the evidence demonstrates that no constitutional right was violated, the Court need go no further in its qualified immunity analysis.

A. Administrative Detention as Punishment

As stated by the Eleventh Circuit, "[t]he determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." Magluta III, 375 F.3d at 1273 (citing Bell v. Wolfish, 441 U.S. 535, 538 (1979)). "An intent to punish on the part of detention facility officials is sufficient to show unconstitutional pretrial punishment." Id. The Fifth Amendment is not offended by conditions of confinement for pretrial detainees needed "to preserve internal order and discipline and to maintain institutional security," Bell, 441 U.S. at 547, or which ensure their appearance at trial. Id. at 534.

The Defendants have presented abundant evidence that Plaintiff's detention in the Special Housing Unit was the result of legitimate and reasonable security concerns surrounding the Plaintiff's confinement at USP-Atlanta. Prior to his first period of detention, the Defendants knew that the Plaintiff had previously absconded while on appeal bond from a Florida state court narcotics conviction and, upon his later arrest in California, had given a false name and again absconded while on bond. (Defs.'

Mot. for Summ. J., Exs. 4, 5.)  More importantly, the Defendants were aware of facts indicating that the Plaintiff had the motive and resources to evade prosecution. Specifically, they had knowledge: (1) that the Plaintiff was a member of the Falcon Cartel and that and he and his associates "were charged as drug kingpins at the top of a continuing criminal enterprise which imported cocaine on such a massive scale that the indictment sought forfeiture of $2.13 billion and 16 parcels of property"; (2) that the charges carried a life sentence without parole; and (3) that the Plaintiff and his associates had extensive ties to Colombian drug lord Pablo Escobar, as well as possible links to the government of Panama.  (Id.)  Finally, they were aware that in the month prior to the Plaintiff's transfer to USP-Atlanta, the United States Marshals Service had warned BOP staff in Miami that they were at risk of being kidnaped by individuals demanding the release of Falcon Cartel associates.  They further reviewed reports indicating: "(1) that while a BOP staff member in Miami was driving home from work a window in his car was broken by a projectile; (2) that on another occasion when the same staff member was driving home he was followed by a car carrying four Latino males; and (3) that other BOP staff in Miami had received anonymous hangup calls."  (Id.)  Based on this evidence, the Defendants concluded that housing the Plaintiff in the general population posed a significant security risk, thus dictating his assignment to administrative detention.

The Defendants have similarly demonstrated strong evidence to justify the Plaintiff's second period of administrative detention.  Following a trip to the Southern District of Illinois to testify at a habeas hearing for a co-defendant, Defendant Garrett gained additional information regarding the security challenges posed by the Plaintiff and other Falcon Cartel detainees.  In reviewing the government's response to the Falcon habeas petition, he learned of numerous attacks against potential government witnesses.  Specifically, Garrett learned that: "(1) Juan Acosta was murdered by Columbian hit men before he could testify to a grand jury; (2) Bernardo Gonzalez (and his brother) were murdered by Columbian hit men; and (3) Lazaro Cruz, Juan Barroso and Luis Escobedo had all been shot."  (Defs.' Mot. for Summ. J., Ex. 4.)  Garrett suspected that the Plaintiff or his associates had directed these attacks.  He also learned that the Plaintiff's counsel had placed advertisements "in a national publication read by inmates identifying certain persons (some of whom were in BOP custody) as involved in 'a major narcotics conspiracy case' and seeking information about them."  (Id.)  Garrett concluded that this was an effort to label as "snitches" those named in the ads, increasing the risk that those witnesses currently in custody would be harmed by other inmates.

Defendant Garrett also learned of extensive efforts to corrupt BOP staff.  He discovered:

> (1) [T]hat BOP intelligence had informant information that a Falcon Cartel associate bribed a BOP staffer to smuggle a cell phone into the housing unit at Metropolitan Correctional Center (MCC) Miami where Magluta was incarcerated; (2) that the cell phone had been used to call Magluta's wife; (3) that an FBI report indicated Magluta had directed a Falcon Cartel associate to provide a BOP staff member in Miami with cocaine; (4) that the same BOP staff member tried to borrow money from Falcon; and (5) that a BOP correctional officer in Miami resigned (purportedly to work in the construction trade) yet later was turned up on Plaintiff's legal team as a "private investigator."

(Defs.' Mot. for Summ. J, Ex. 4.)[2] This caused him to have significant concerns about the potential for the Plaintiff to bribe members of the USP-Atlanta prison staff. Defendant Garrett further learned that the Plaintiff and some of his Falcon Cartel associates might be seeking the aid of corrupt USP-Atlanta officials to assist in an escape plot.  Information from an informant detailed an elaborate plot by Falcon to escape by "having accomplices create a diversion (possibly involving a helicopter and/or the dumping of a dead 'lookalike' body near the prison perimeter) during which Falcon would abscond with the help of a corrupt BOP staffer."  (Id.)  Garrett became concerned of the possibility that the Plaintiff was plotting an escape and might

---

[2]The Plaintiff, in his motion for summary judgment, highlights an excerpt from Defendant Samples' 2005 deposition stating that the prison's "primary confidential informant"has since been discredited.  (Pl.'s Mot. for Summ. J., at 9.)  Defendant Garrett's testimony demonstrates, however, that his 1994 determination that the Plaintiff posed a serious security risk was based only in part on informant information. (Defs.' Mot. for Summ. J., Ex. 4.)  Given the breadth of evidence relied upon by Garrett, the fact that an informant has since been discredited does not demonstrate that the Defendants' lacked legitimate security interests in making this determination.

be passing along oral instructions to outside accomplices through other inmates "directing them to attack government witnesses, to probe the security precautions used when [the Plaintiff] was transported to court appearances and to intimidate BOP staff." (Id.)

Finally, evidence developed in the Plaintiff's 1993 habeas corpus action challenging his placement in administrative detention at the federal prison in Miami reinforced the Defendants' concerns about the Plaintiff.  In that case, the district judge ruled that the Plaintiff's administrative detention in Miami was justified due to the serious nature of the security concerns surrounding the underlying criminal action, where four witnesses had been shot, two of them fatally.  "As such the Court finds that [the Plaintiff's] current detention is not punitive in nature but, rather, relates to legitimate governmental security concerns for individuals inside MCC, individuals outside MCC, and prison employees themselves." Magluta v. Fitzpatrick, No. 93-CV-1438 (S.D. Fla. 1993).

This Court finds that the Plaintiff's administrative detention at USP-Atlanta was the result of legitimate security concerns.  Moreover, the Plaintiff has presented no evidence to demonstrate that the Defendants had a punitive intent in making this decision.  The Court, therefore, concludes that summary judgment for the Defendants is warranted on this claim.

B. Procedural Due Process

There can be no procedural due process violation without the deprivation of a protectable liberty or property interest.  Accordingly, the Plaintiff must first establish that the decision to place him in administrative segregation resulted in the deprivation of a protected liberty interest.  Where the asserted interest is protected by the Due Process Clause, the question then becomes what process is due to protect that interest.  See Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989).  Thus, in order to maintain this claim, the Plaintiff must demonstrate both a protected liberty interest and that he was not afforded sufficient process in the deprivation of that interest.

1. Plaintiff's Liberty Interest

The Plaintiff was deprived of his liberty when the decision was made to detain him pending trial.  That deprivation of liberty is not at issue in this lawsuit.  The Court of Appeals has said that there are two circumstances in which a prisoner can be further deprived of his liberty so as to require due process.  Bass v. Perrin, 170 F.3d 1312 (11th Cir. 1999).  "The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court."  Id. at 1318.  "The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the

deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Id. (quoting Sandin v. Connor, 515 U.S. 472, 484 (1995)).  The first criteria is not applicable here because the Plaintiff was a pretrial detainee.  The issue then is whether placing the Plaintiff in administrative segregation for more than three months imposed atypical and significant hardship on the Plaintiff in relation to the ordinary incidents of prison life.

In Sandin, the plaintiff alleged that Hawaii state prison officials had deprived him of a liberty interest by confining him to disciplinary segregation for 30 days.  The Supreme Court denied his claim because his confinement "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction."  Sandin, 515 U.S. at 486.  For many lower courts, this meant that no liberty interest exists where a prisoner merely alleges that he was confined under conditions identical to those of other prisoners in administrative detention.  See Jones v. Baker, 155 F.3d 810, 812 (6th Cir. 1998); Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997); Wagner v. Hanks, 128 F.3d 1173, 1175 (7th Cir. 1997); Pichardo v. Kinker, 73 F.3d 612, 613 (5th Cir. 1996); Johnson v. Bureau of Prisons, 2000 WL 574881, at *4 (D. Kan. April 4, 2000); see also Ramirez v. Galaza, 334 F.3d 850, 861 (9th Cir. 2003) (analyzing an inmate's alleged liberty interest based on three factors: (1) whether the conditions mirrored those in administrative segregation and protective custody; (2) the

duration and degree of restraint; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence).[3] Other courts, however, have compared the prisoner's terms of detention not with inmates in administrative segregation, but instead with the conditions in the general prison population.  See Sealey v. Giltner, 197 F.3d 578, 586 (2d Cir. 1999); Hatch v. District of Columbia, 184 F.3d 846, 856 (D.C. Cir. 1999); Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997).

The Eleventh Circuit has never explicitly stated its position on this issue.  In Magluta III, the court held that the Plaintiff had alleged a protected liberty interest based on his assertion that he "was confined under extremely harsh conditions-in solitary confinement (under conditions unlike other pretrial detainees or even convicted prisoners), locked in an extremely small, closet-sized space, and with minimal contact with other human beings for a prolonged time exceeding 500 days." Magluta III, 375 F.3d at 1282.  The Court of Appeals concluded that these conditions

---

[3]Notably, these cases involved convicted prisoners rather than pretrial detainees. However, the Supreme Court has clearly stated that pretrial detainees can cause just as great a risk to prison security, and thus should be treated no differently in reviewing challenged security practices.  Bell, 441 U.S. at 547 n.28.  A federal defendant is sent into pretrial detention "only because no other less drastic means can reasonably assure his presence at trial."  Id.  It is well settled, moreover, that prison authorities should receive proper deference from the courts in making "the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees."  Block v. Rutherford, 468 U.S. 576, 591 (1984) (citing Bell, 441 U.S. at 557 n.38).  The Court finds this logic equally persuasive in examining an inmate's liberty interest.

constituted an atypical and significant hardship on the Plaintiff.  Left undetermined, however, was whether the Plaintiff would still have met his burden if he had shown only that his conditions were the same as other pretrial detainees housed in administrative confinement.

This Court finds, as have the majority of jurisdictions, that in order to establish a liberty interest, a prisoner must show that his conditions of confinement were atypical and significant when compared to other administrative detainees.  This conclusion is based on both the clear language and purpose of <u>Sandin</u>.  Prior to that decision, a prisoner could establish a liberty interest by pointing to language of any state prison regulation of "unmistakably mandatory character."  <u>Hewitt v. Helms</u>, 459 U.S. 460, 471 (1983).  This inspired a generation of inmates to comb prison regulations in search of entitlements, and left federal courts with the onerous task of interpreting "intricate, often routine prison guidelines."  <u>Sandin</u>, 515 U.S. at 480. <u>Sandin</u> was an attempt to ensure that the federal courts were no longer involved in the day-to-day management of the prison system, "often squandering judicial resources with little offsetting benefit to anyone."  <u>Id.</u> at 482.  Thus, it is this Court's conclusion that <u>Sandin</u> meant exactly what it said: a prisoner demonstrates a liberty interest where he shows that his conditions of confinement were atypical and significant in

comparison to that of inmates "in administrative segregation and protective custody." Id. at 486.

Here, the Defendants have presented undisputed evidence that the conditions of the Plaintiff's confinement were the same as other pretrial detainees in administrative detention.  (Defs.' Mot. for Summ. J., Ex. 16.)  Moreover, contrary to the Plaintiff's claim that he was locked in an "extremely small, closet-sized space," all cells in the Special Housing Unit had 90 square feet of floor space.  He was almost always alone in the cell.  (Defs.' Mot. for Summ. J., Ex. 4.)  Indeed, housing two inmates in a cell of only 63 square feet does not violate the Eighth Amendment.  See Rhodes v. Chapman, 452 U.S. 337, 367 n.15 (1981); see also Hoptowit v. Ray, 682 F.2d 1237, 1248 (9th Cir. 1982) (noting that American Correctional Association guidelines require only 80 square feet for inmates who spend more than 10 hours a day in their cell).  The size of the Plaintiff's cell did not constitute a significant hardship.  Furthermore, contrary to the Plaintiff's claim that he had only minimal contact with other human beings, the Defendants have demonstrated that the Plaintiff in fact spent an average of almost five hours a day, and sometimes as many as nine, outside his cell meeting with attorneys and socializing with visitors.  (Id., Ex. 10.) This is far more time outside the cell than is permitted to administrative detainees in other prisons.  See Sandin, 515 U.S. at 472 (finding no liberty deprivation where the

plaintiff had spent 23 hours and 10 minutes a day in his cell); Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2003) (stating that normal conditions of SHU confinement involve 23 hours a day in a cell).  The Plaintiff's conditions of confinement were in fact no different than any other prisoner in administrative detention.  His allegations thus fail to demonstrate a viable liberty interest.  Summary judgment for the Defendants on this claim is warranted.

2. Sufficient Due Process

Assuming arguendo that the Plaintiff had shown a deprivation of a liberty interest by the conditions of his confinement, he must also demonstrate that he was provided insufficient process.  To determine whether process was sufficient, the Court must engage in a two part inquiry, as well as a balancing of the competing interests at stake in this case.  When a prisoner is transferred to administrative segregation, the Supreme Court first requires "an informal, nonadversary evidentiary review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation." Hewitt, 459 U.S. at 472.  For a prison inmate, process requires that he "merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the

inmate will accomplish this purpose..." Id. at 476. In determining a "reasonable time," a court must consider an inmate's "relatively insubstantial private interest" coupled with the prison officials' traditionally broad discretion. Id. at 476 n.8. Following this initial determination, the prison official must engage in some sort of periodic review. Hewitt, 459 U.S. at 477 n.9. However, this placement decision continues to be a highly subjective one, based on the prison official's knowledge of the "prison conditions and tension." Id. Thus, it is not one that requires any highly structured proof.[4] Finally, in examining the sufficiency of the process provided to the prisoner, the Court engages in a Mathews[5] balancing test, weighing "[1] the private interests at stake in a governmental decision, [2] the governmental interests involved, and [3] the value of procedural requirements." Sheley v. Dugger, 833 F.2d 1420, 1426 (11th Cir. 1987) (quoting Hewitt, 459 U.S. at 951-52).

Here, the evidence demonstrates that the Plaintiff received due process. During the initial assignment to administrative detention, he filed a habeas petition.

---

[4]The Plaintiff argues that the Defendants are required to provide the full panoply of procedural rights listed under 26 C.F.R. § 541.22. The Eleventh Circuit expressly held, however, that "the procedural requirements set out in the regulation are not themselves constitutional mandates." Magluta III, 375 F.3d at 1279 n.7. The appellate court concluded that only "fairly minimal due process was required." Id. (citing Hewitt, 459 U.S. at 472-77).

[5]See Mathews v. Eldridge, 424 U.S. 319, 335 (1976) (ruling that the constitutional sufficiency of administrative procedures is determined by examining three distinct factors).

Defendant Warden Stock reviewed the information regarding the security concerns posed by the Plaintiff, and four days later, listened to the Plaintiff's counsel's arguments at a meeting mediated by a magistrate judge. (Defs.' Mot. for Summ. J, Ex. 11.) Following that conference, Stock reconsidered the Plaintiff's case and transferred him back into pretrial detention.  (Id.)  Defendant Garrett conducted a review of the case before the Plaintiff was again placed in administrative detention.  This evidence included "a Marshals Service report regarding Magluta attempt to escape at the time of his arrest; a Marshals Service report regarding suspicious behavior by Magluta and his co-defendants while being transported to and from court; BOP reports regarding escape plots by members of the cartel; and BOP reports regarding efforts by members of the cartel to corrupt BOP staff."  (Defs.' Mot. for Summ. J., Ex. 4.)  On February 16, 1994, Garrett then ordered an investigation of the Falcon Cartel in order to confirm or deny this information regarding the security risks posed by the Plaintiff and his associates.   He emphasized, moreover, the necessity of this updated information, as it bore "upon the placement and classification of these inmates while they are awaiting trial."  (Id.)  Over the next twelve weeks, as this information was gathered, Garrett received periodic oral briefings on the investigation's progress.  The final report, submitted on May 17, 1994, concluded that the Plaintiff and his associates continued to pose a security risk and should remain in administrative detention.  (Id.)

Upon reviewing this report, Garrett determined that the Plaintiff should stay in the Special Housing Unit.  The Court finds that the Defendants conducted what amounted to an almost continuous review of the Plaintiff's security status during the relevant period.  This more than meets the requirements for periodic review outlined in <u>Hewitt</u>.

Furthermore, the Plaintiff received sufficient evidentiary review whenever he challenged his housing assignment.  As previously discussed, during his first period of confinement, a meeting was conducted before a magistrate judge that resulted in his transfer back into pretrial detention.   When he was again transferred to administrative detention on January 28, 1994, he received an administrative detention order providing him with the reasons for the change in his housing.  (Defs.' Mot. for Summ. J, Ex. 8.)  Following the Plaintiff's motion for hearing in his habeas case and request for a writ of habeas corpus ad testificandum, a magistrate judge conducted a hearing at which both the Plaintiff and an expert witness testified. (<u>Id.</u>, Ex. 4.)  The Plaintiff's counsel was also permitted to cross-examine Defendants Garrett and Stock as to the reasons behind the Plaintiff's housing assignment.  (<u>Id.</u>)

The Plaintiff also had the opportunity to challenge his housing assignment through the BOP's administrative process.  On or about May 13, 1994, the Plaintiff submitted a BP-9 form to Defendant Stock with a three page "Memorandum in

Support" attached that had apparently been prepared by the Plaintiff's attorneys. (Defs.' Mot. for Summ. J., Ex. 11.)  On June 3, 1994, the Plaintiff received a second administrative detention order explaining the reasons for his housing placement.  (Id., Ex. 12.)  Five days later, he received a response to his BP-9, explaining the security concerns behind his administrative detention in as much detail as could be revealed. (Id., Ex. 11.)   He was advised that he was considered an escape risk, and that information had come to light indicating he was possibly involved in conspiracy to commit murder, introduction of contraband and bribery.

The Plaintiff then appealed that decision on June 13, 1994, submitting a BP-10 form to the regional office with a "Memorandum in Support."  The next day, he received a third administrative detention order, again stating that he was an escape risk.  On June 29, 1994, the Plaintiff received a ten-page, single-spaced response to his BP-10 setting forth those security concerns regarding his housing that could appropriately be revealed.  (Defs.' Mot. for Summ. J., Ex. 14.)  On July, 11, 1994, the Plaintiff submitted a BP-11 form to the BOP national office, the final stage of appeal allowed under BOP rules.  On September 16, 1994, he received a response denying his appeal.  (Id., Ex. 15.)

Finally, in evaluating due process, this Court must balance the competing interests at stake as prescribed under Mathews, 424 U.S. at 335.  Here, as in Hewitt,

the private interests at stake are fairly minimal, as the Plaintiff was "merely transferred from one extremely restricted environment to an even more confined situation." Hewitt, 459 U.S. at 473.  The governmental interests, by contrast, are quite significant. As set forth above, the Plaintiff's residence in the general population posed serious security risks to the prison environment.  Evidence indicated that Plaintiff and his associates may have been plotting to kill witnesses and stage an escape from the prison.  The Plaintiff thus posed a safety risk to prison guards and inmates slated to testify against him and his associates.  Ensuring the safety of inmates and staff is "perhaps the most fundamental responsibility of the prison administration."  Hewitt, 459 U.S. at 473.  Finally, the evidence does not indicate that these decisions would have been materially assisted by a detailed adversary proceeding.  "A prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." Id.  Because judgments regarding the safety of the prison are based largely on "purely subjective evaluations and on predictions of future behavior," this process "would not be appreciably fostered by [] trial-type procedural safeguards."  Id.  Here, moreover, the Plaintiff received the opportunity to present evidence and witnesses in a habeas corpus proceeding before a magistrate judge.  This more than satisfies the requirement of an informal, non-adversarial review.  The Court thus finds that the Plaintiff was provided with all the process due to him.

IV. <u>CONCLUSION</u>

For the reasons set forth above, the Plaintiff's Motion for Summary Judgment [Doc. 107] is DENIED and the Defendants' Motion for Summary Judgment [Doc. 108] is GRANTED.

SO ORDERED, this 18 day of April, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge